[Cite as *State v. Gilcrease*, 2020-Ohio-487.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 108148 |
| v. | : | |
| RODERICK GILCREASE, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** February 13, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-620782-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brian D. Kraft, Assistant Prosecuting Attorney, *for appellee.*

The Law Offices of Eric L. Foster, and Eric L. Foster, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Roderick Gilcrease appeals from the trial court's judgment of conviction and sentence entered by the Cuyahoga County Court

of Common Pleas following a bench trial in which he was found guilty of two counts of improperly discharging into habitation, three counts of discharge of a firearm on or near prohibited premises, one count of tampering with evidence, and two counts of carrying a concealed weapon. After a thorough review of the record, we find the trial court did not err in denying Gilcrease's motion for a mistrial, Counts 1 through 4 were supported by sufficient evidence, Gilcrease's convictions for Counts 1 through 4 and Count 19 were not against the manifest weight of the evidence, and the trial court's imposition of a consecutive sentence was supported by the record. We therefore affirm Gilcrease's convictions and the trial court's imposition of consecutive sentences. Because we find, however, that the trial court failed to sentence Gilcrease in open court on Count 13, carrying a concealed weapon, we vacate the sentence imposed on this count alone and remand for the limited purpose of resentencing on Count 13.

## I. Procedural History

{¶ 2} On October 10, 2017, Gilcrease was charged in a 20-count indictment, arising from four separate incidents on three different dates. The charges pertaining to an incident on May 14, 2017, involve two "house shootings" and include: Count 1 — improperly discharging into habitation in violation of R.C. 2923.161(A)(1) (victim, Orvis Alexander); Count 2 — discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3); Count 3 — improperly discharging into habitation in violation of R.C. 2923.161(A)(1) (victim, Sondi Robinson); and Count 4 — discharge of firearm on or near prohibited premises in

violation of R.C. 2923.162(A)(3).  Counts 1, 2, and 4 include one- and three-year firearm specifications.

{¶ 3} The charges pertaining to an incident on or about June 2, 2017, involve a shooting at a gas station and include: Counts 5 through 10 — felonious assault in violation of R.C. 2903.11(A)(2) (different victims for each count); Count 11 — discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3); Count 12 — tampering with evidence in violation of R.C. 2921.12(A)(1); and Count 13 — carrying a concealed weapon in violation of R.C. 2923.12(A)(2).  Counts 5 through 10 include one- and three-year firearm specifications.

{¶ 4} The charges pertaining to an incident on June 26, 2017, occurring on a public roadway, include:  Count 14 — aggravated murder in violation of R.C. 2903.01(A) (victim, Dominique Robinson); Count 15 — murder in violation of R.C. 2903.02(B) (victim, Dominique Robinson); Count 16 — felonious assault in violation of R.C. 2903.11(A)(1) (victim, Dominique Robinson); Count 17 — felonious assault in violation of R.C. 2903.11(A)(2) (victim, Dominique Robinson); Count 18 — felonious assault in violation of R.C. 2903.11(A)(2) (victim, Raheem Overby); Count 19 — discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3); and Count 20 — carrying a concealed weapon in violation of R.C. 2923.12(A)(2).  Counts 14 through 19 include one-, three-, and five-year firearm specifications.

{¶ 5}  Having waived his right to a jury trial, this matter proceeded to a bench trial on October 22, 2018.  At the close of the state's evidence, the court granted Gilcrease's Crim.R. 29 motion for dismissal regarding Counts 5 through 11 and Count 14, and the state moved the court to dismiss the five-year firearm specification in Count 19.  The court then found Gilcrease guilty on Counts 1 through 4, 12, 13, 19, and 20.  The court found Gilcrease not guilty on Counts 15 through 18.

{¶ 6}  On January 15, 2019, the court imposed the following prison sentence: Count 1 — 8 years on the underlying offense and 3 years on the firearm specification; Count 2 — 3 years on the underlying offense and 3 years on the firearm specification; Count 3 — 7 years; Count 4 — 3 years on the underlying offense and 3 years on the firearm specification; Count 12 — 15 months; Count 13 — 15 months; Count 19 — 10 years on the underlying offense and 3 years on the firearm specification; and Count 20 — 15 months.  The court merged the firearm specifications in Counts 1 and 2 and ordered them to be served concurrently.  The court also ordered the firearm specifications in Counts 4 and 19 to be served consecutively to each other and consecutive to the firearm specifications in Counts 1 and 2, for a total prison term of 9 years on the specifications.[1]  The court then ordered the sentences on the underlying offenses in Counts 2 and 4 to be served consecutively and the sentences on the underlying offenses in Counts 1, 3, 12, 13, 19,

---

[1] This sentence reflects what was stated in the trial court's sentencing entry. Because we find error with respect to the sentence imposed on Count 13, we will address this sentence in the final assignment of error in which we address the trial court's sentence.

and 20, to be served concurrently to each other but consecutive to the sentences in Counts 2 and 4, for a total prison term of 16 years on the underlying offenses. Gilcrease's aggregate prison term is 25 years.

{¶ 7} Gilcrease now appeals, raising four assignments of error:

(1) the trial court erred by denying Defendant's motion for a mistrial;
(2) the trial court erred by rendering guilty verdicts on Counts One, Two, Three, and Four, as they are not sustained by sufficient evidence;
(3) the trial court erred by rendering guilty verdicts on Counts One, Two, Three, Four, and Nineteen, as they are against the manifest weight of the evidence; and
(4) the trial court erred by imposing consecutive sentences where they are not supported by the record.

## II. Evidence at Trial

### Sondi Robinson

{¶ 8} Sondi Robinson testified that in May 2017 she lived on Maud Avenue in Cleveland, Ohio, with her son, Dominique Robinson ("Dominique"). Ms. Robinson testified that on the evening of May 14, 2017, someone shot at her house. She explained that she was getting a drink from her refrigerator when she heard glass popping and then she heard gunshots. She stated that she heard gunshots "across the front of my porch * * * coming through the window, through a dresser into the living room, [and] through the front door into the kitchen." Ms. Robinson observed damage caused by bullets to several parts of her home, including the front porch, window, living room dresser, and front door to her kitchen. Her son was not at home at the time of the shooting but she phoned him and told him what happened. Ms. Robinson phoned the police.

{¶ 9} Ms. Robinson also testified regarding how she learned that her son Dominique had been killed one month after the shooting into her home, in June 2017. She received a phone call from her son's friend on the evening of June 26, 2017, advising her that she should get to the hospital. Ms. Robinson ultimately learned that her son had died.

### Officer McGreer

{¶ 10} Cleveland police officer Eric McGreer was on patrol with his partner when he received a call from dispatch concerning shots fired into a residence on Maud Avenue. Officer McGreer observed empty bullet casings in the front of the house and inside the house, as well as two bullet fragments inside the home. He ultimately collected a total of 12 casings, including six .40 caliber casings and six 9 mm casings, from the front yard of the house, the sidewalk, and the street. The casings did not appear to be weathered or damaged. The officer then submitted the casings as evidence.

### Orvis Alexander

{¶ 11} Orvis Alexander testified that in May 2017 she lived on Simon Avenue in Cleveland, Ohio. She lived near Maud Avenue, where Ms. Robinson lived. Ms. Alexander testified that she knew Ms. Robinson from the neighborhood.

{¶ 12} Ms. Alexander testified that on the evening of May 14, 2017, she returned home very late and discovered that her house had been "shot up." She observed several bullet holes throughout the house, including the front porch banister, a window, and the side of the house. Some of the damage was observed

from within the home, including bullet holes in the living room wall.  Ms. Alexander also phoned the police.

### Officer Gaviria

{¶ 13} Cleveland police officer Anglly Gaviria responded to the scene of shots fired into a habitation on Simon Avenue on May 14, 2017.  She observed several bullet holes "going from the front of the house * * * all the way to the rear where the kitchen was [located]."  Upon investigation, the officer recovered 31 bullet casings located on the street in front of the house, which included fourteen .40 caliber casings and seventeen 9 mm casings, and submitted them as evidence.

### Latasha Minter

{¶ 14} Latasha Minter knew Dominique and his mother from the neighborhood.  She testified that she used to stay a couple of houses away from his house on Maud Avenue.  Minter also knew Gilcrease "through [her] sister."  She testified that she had "more than a friendship" with Gilcrease approximately ten years ago.

{¶ 15} Minter testified concerning the incident that occurred at the Sunoco gas station on June 2, 2017, into the following day.  She testified that she was driving her sister's car that night and Gilcrease was with her.  Avantay Martin, the defendant's cousin, drove separately.  They all drove to the Sunoco so that Martin could purchase something from the convenience store.  Both Martin and Minter parked their vehicles at the pumps.  Martin asked Minter if she wanted anything from inside, Minter gave him some money for gum and pop, and Martin went inside

the store.  Shortly thereafter, Martin returned to Minter's car and handed Minter the items he purchased for her.  Minter testified that when she bent down to set her pop and gum in the cup holder, she heard several gunshots and glass breaking, and she knew they were "getting shot."  She stated that she did not know from which direction the shots were coming because she had her head down.  Minter testified that she did not see anyone, including Gilcrease, fire a weapon, but after the gunshots ceased, she saw that Gilcrease was bleeding.  The police and EMS arrived, and Gilcrease was transported to the hospital.

{¶ 16}  Minter also testified concerning the events that transpired on June 26, 2017.  Earlier in the evening, Minter, Minter's sister, Natanya Thompson, Gilcrease, and Gilcrease's cousins, Martin and Jameel, were hanging out at Martin's house, talking, smoking, and drinking.  In the course of the evening, the group left Martin's house numerous times, at least once to purchase marijuana from a friend and once to purchase snacks for Martin's son.

{¶ 17}  After Martin purchased snacks for his son, Thompson drove Martin and his son back to their house and dropped them off for the night.  Minter, Thompson, and Gilcrease then left Martin's house for the last time that evening.  Minter stated that Thompson was going to drive Gilcrease and Minter home.  Gilcrease was seated in the backseat of Thompson's car, behind the driver, and Minter was seated in the middle seat next to Gilcrease.

{¶ 18}  Minter testified that they were driving eastbound on St. Clair, toward Martin Luther King Boulevard ("MLK"), when they noticed another vehicle

following closely behind them. They eventually proceeded to drive down MLK. When they stopped, the other car pulled up next to Thompson. Minter recognized the two people in the car as her brother's friends — Dominique, the front seat passenger, and Dominique's friend, Raheem Overby ("Raheem"), the driver. Once Minter recognized the two people in the car, she "sat back and kept playing on [her] phone" while her sister spoke with the people in the other car. Minter testified that "the next thing I remember [is] hearing gunshots" coming from her left where Gilcrease was seated. She remembered "three or four" shots. She stated that just before the shooting, Gilcrease had asked her to hold his drink. Minter stated that although she had seen Gilcrease with a gun earlier in the day, she did not see him with a gun at that moment in the car. After the shooting, the two cars pulled off in different directions. Minter later learned that Dominique had been killed.

Natanya Thompson

{¶ 19} Natanya Thompson, Minter's sister, had known the victim, Dominique, from the neighborhood since 2006 and was friends with him at the time of his death. Thompson testified that the victim's mother, Sondi Robinson, is related to one of her brothers. Thompson has known Gilcrease from the neighborhood since 2007.

{¶ 20} Thompson testified concerning the events of June 26, 2017. She stated that she, Minter, Gilcrease, and Avantay were talking and drinking at Avantay's house for a couple of hours. After driving to the gas station and back with Avantay, Thompson dropped Avantay off at his home and then proceeded to go

home.  Thompson stated that Gilcrease was sitting behind her in the vehicle and her sister, Minter, was seated next to Gilcrease.

{¶ 21}  Thompson testified that she was driving eastbound on St. Clair, and when she turned right onto MLK, she noticed a car traveling closely behind her.  She proceeded to take a right onto Wade Park Avenue when the car that was behind her pulled up next to her.   She saw through her window, which was rolled down, that Dominique and Raheem were in the other car.   She knew Raheem from the neighborhood, and they were friends.  Thompson stated that she was initially nervous when she noticed a car following her, but when she saw Dominique and Raheem in the car, she was "okay."  She testified that when she looked at the other car, Dominique was "cheesy smiling" and said, "hey."  She said, "hey," and then began to "pull off" when she heard gunshots.  Thompson stated that she did not know how many shots were fired, but there was more than one shot.  Nor did she know from which direction the shots were coming because she ducked down in her seat.  At some point, her sister told her to drive away.

{¶ 22}  When she lifted her head back up, the other vehicle was gone.  Thompson stated that she was concerned someone had been shot.  Later in the evening, after the shooting, she phoned Dominique to see what happened and he did not answer his phone.  She later learned that Dominique died as a result of the shooting that night. She eventually spoke with the police about the incident and told Dominique's mother what had transpired that evening and who was in the car with her.

{¶ 23} Thompson further testified that the gunshots were so loud her ears were ringing. When the police officers interviewed her, she indicated that some of the gunshots came from behind her. She recalled being "in shock" when Gilcrease apologized to her. Finally, Thompson testified that she discovered one bullet hole in her car from that night, and she concealed it with a sticker.

### Raheem Overby

{¶ 24} Raheem Overby testified that he was driving Dominique to the hospital on the evening of June 26, 2017, so that Dominique could visit his sick child. He testified that he pulled up to a red light at MLK and Wade Park when he heard gunshots: "I heard the first one, pow. The window bust and so I duck and take off. And after that I heard three more. Like I heard the trunk get hit. I heard about three more shots, like pow pow pow, pow and we was fleeing." Raheem testified that the gunshots came from their right side.

{¶ 25} As Raheem was driving away, Dominique grabbed his hand. At this point, Raheem guessed that Dominique had been shot. Raheem denied that he had been following another vehicle. Raheem further testified that although Dominique had a gun that evening because he "always" carries a gun, Raheem was "pretty sure" Dominique did not fire his weapon that evening. Raheem drove Dominique to the hospital.

### Officer Morris

{¶ 26} Cleveland police officer Samuel Morris was working the night shift on June 26, 2017, when he was dispatched to the Cleveland Clinic for a male who

had been shot. Officer Morris testified that when he arrived on the scene, he observed a vehicle with gunshots to the passenger side of the vehicle as well as the trunk. He learned that a firearm was recovered from the vehicle prior to his arrival, and he secured the firearm in his patrol car. The officer observed that the firearm was jammed.

{¶ 27} Officer Morris learned that Raheem, who was on the scene when the officer arrived, was the driver of the vehicle containing the bullet holes. The officer interviewed Raheem and then transported him to the police station for questioning.

### Detective Reese

{¶ 28} Cleveland police detective Aaron Reese responded to the gas station shooting on June 3, 2017. The detective learned that a male had been shot and had been transported to the hospital by the time the detective arrived on the scene. The male was identified as Gilcrease.

{¶ 29} Detective Reese observed the vehicle containing bullet holes on the scene and found the vehicle had "several rounds [that] were shot into." Additionally, the inside of the vehicle had significant damage from bullets. The detective observed several spent shell casings in the vehicle's interior, which caused him to believe that someone was shooting from inside the vehicle.

{¶ 30} Detective Reese obtained video surveillance from the gas station. The detective testified as to what the video depicted:

> I saw that Gilcrease was a passenger in a vehicle that was shot into and he ultimately was shot. And I watched him get out of the vehicle and shoot all over the place, many different directions. I watched him

go into the gas station where he was bleeding significantly. He made a phone call. And then I watched as one of his friends arrived on [the] scene. Gilcrease went outside and handed his gun off to his friend, I assume the person he called, before he approached the police.

{¶ 31} Detective Reese testified that he also discovered multiple .40 caliber shell casings on the scene, near the entrance and the exit of the gas station, in addition to the casings discovered in the car's interior. He interviewed witnesses on the scene and ordered the vehicle towed. Finally, Detective Reese submitted the video and the shell casings into evidence. Ultimately, the evidence submitted from this scene included five .40 caliber casings recovered from the ground and nine .40 caliber casings recovered from the vehicle's interior.

### Detective Clemens

{¶ 32} Cleveland police detective Todd Clemens was working in the crime scene unit when he responded to the city's impound facility on June 3, 2017. Detective Clemens processed the vehicle that was involved in the shooting at the gas station that evening.

{¶ 33} He testified concerning the vehicle's damage caused by bullets, including defects in the windshield, the driver's side rear window, and the rear window. The detective recovered nine .40 caliber shell casings from the car's interior, which he submitted as evidence. He testified that eight of the nine casings were found in the passenger side of the vehicle. Finally, Detective Clemens testified that based upon the location of the casings, he believed that the weapon was fired from inside the vehicle.

Detective Peoples

{¶ 34} Cleveland police detective Mark Peoples was working in the crime scene unit when he responded to a felonious assault shooting at the Sunoco gas station on June 3, 2017. Detective Peoples photographed the scene and collected evidence. He recovered several spent .40 caliber shell casings.

{¶ 35} Detective Peoples also responded to the scene of a homicide at Wade Park and Ansel Road on June 26, 2017. The officers first responding to the scene had already secured the scene from pedestrian and vehicle traffic when he arrived. Detective Peoples proceeded to photograph the scene and collect evidence.

{¶ 36} The detective testified concerning spent shell casings that were discovered in the street. He testified that there were two distinct groups of casings recovered. The first group contained a cluster of nine .40 caliber casings, which the detective marked as numbers 1 through 9. This cluster of casings was discovered at the intersection of Wade Park and Ansel Road. The second cluster of casings consisted of five .40 caliber casings, numbered 10 through 14. This cluster was discovered "across the street from the original group of nine." He also stated this cluster was on "the other side of the street." The casings were submitted as evidence.

{¶ 37} Detective Peoples also photographed the vehicle that was left at the Cleveland Clinic and processed the evidence from the vehicle. He testified that the rear passenger side tire was flat, the passenger side rear window had been "smashed out," there were suspected bullet defects to the passenger side of the vehicle, and there was suspected blood found in the front passenger seat. Detective Peoples also

testified that he recovered a spent 9 mm casing inside the vehicle. Additionally, the detective stated that another officer had recovered a firearm from inside the vehicle and that firearm was given to the detective to photograph. Detective Peoples testified that this firearm contained 15 live rounds that had not been fired, one of which was located inside the chamber.

### Detective Shapiro

{¶ 38} Cleveland police homicide detective David Shapiro also responded to the scene of the homicide at Wade Park and Ansel Road on June 26, 2017, where the crime scene unit had already begun processing the scene. Detective Shapiro testified that he observed two separate groups of shell casings, all of which were the same caliber.

{¶ 39} The detective further testified that his investigation continued to the Cleveland Clinic where he observed the vehicle that had been at the shooting on Wade Park and Ansel Road. He testified that the vehicle had heavy rear end damage, "obvious defects in the passenger side," evidence of blood, and broken windows.

### James Kooser

{¶ 40} James Kooser, a firearms and toolmarks examiner with the Cuyahoga County Regional Forensic Science Laboratory, testified as a ballistics expert. Kooser testified that he analyzed all the evidence submitted to him on this case, which included the spent casings recovered from the incidents at the two residences, the gas station, and the intersection of Wade Park and Ansel Road. He further testified that all of the .40 caliber casings he received for examination in this

case were fired by the same unknown Smith & Wesson .40 caliber pistol, including the casings recovered near the homes on Simon Avenue and Maud Avenue on May 14; from the ground and from the vehicle's interior at the Sunoco gas station on June 3; and from two different locations in the street at the Wade Park/Ansel Road intersection on June 26. Kooser explained that the firearm is "unknown" because no firearm was recovered from the scenes or submitted for comparison.

### Roderick Gilcrease

{¶ 41} Gilcrease testified on his own behalf. He admitted that he possessed a .40 caliber firearm on June 3 and June 26 but denied having this firearm on May 14 and denied firing his gun on May 14. Gilcrease also admitted to giving his firearm to a friend at the gas station following the shooting. Gilcrease testified that this friend later returned the same firearm.

### III. Motion for a Mistrial

{¶ 42} In his first assignment of error, Gilcrease contends that the trial court erred when it denied his motion for a mistrial. In support, he argues that Detective Reese violated his due process rights when the detective testified on redirect that Gilcrease asserted his Fifth Amendment right to remain silent. According to Gilcrease, the state elicited this testimony to imply that Gilcrease's assertion of his Fifth Amendment right to remain silent was evidence that Gilcrease was guilty of the offense charged, and therefore, the court abused its discretion in denying his motion for a mistrial.

{¶ 43} Trial courts enjoy broad discretion in ruling on motions for mistrial. *State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001). Absent an abuse of discretion, a reviewing court will not reverse a trial court's decision regarding a motion for a mistrial. *State v. Benson*, 8th Dist. Cuyahoga No. 87655, 2007-Ohio-830, ¶ 136. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 44} A mistrial should not be ordered in a criminal case "merely because some error or irregularity has occurred, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Wilson*, 8th Dist. Cuyahoga No. 92148, 2010-Ohio-550, ¶ 13, citing *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). Thus, a trial court should declare a mistrial "only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). The essential inquiry on a motion for mistrial therefore is whether the substantial rights of the accused or the prosecution are adversely or materially affected. *Wilson*, citing *State v. Goerndt*, 8th Dist. Cuyahoga No. 88892, 2007-Ohio-4067, ¶ 21.

{¶ 45} Here, Detective Reese testified on direct examination regarding his investigation into the gas station shooting on June 3. He stated that he watched the surveillance video of the incident, which showed Gilcrease being shot while he was

a passenger in a vehicle. According to the detective, the video also showed Gilcrease exit the vehicle, "shoot all over the place, many different locations," enter the gas station where he placed a phone call, and then exit the gas station and hand off his gun to a friend before he approached the police. Detective Reese further testified that by the time he had arrived on the scene, Gilcrease had been transported to the hospital for treatment of his gunshot wound. He later questioned Gilcrease in the hospital concerning the incident. The detective stated that Gilcrease was an uncooperative victim and therefore the detective was not able to obtain any information from Gilcrease to aid in the detective's investigation.

{¶ 46} On redirect examination, the prosecutor asked Detective Reese if he would view the surveillance video, speak with witnesses, and ascertain the location of the casings in order to determine the intention of a shooter, to which the detective replied in the affirmative. The prosecutor then asked Detective Reese if he learned anything on June 5 that would have affected his analysis of the shooting, to which the detective replied, "Yes." Thereafter, the following discourse, which forms the basis of the defense's motion, occurred:

> Prosecutor: What was that?
> Witness: The video.
> Prosecutor: The video. Did you ever — how about anything, any of Roderick Gilcrease's own words, did anything that he say come into your analysis, as well?
> Witness: Yes.
> Prosecutor: What was that?
> Witness: When he plead the Fifth when I asked him if he had —
> Prosecutor: Strike that.
> Court: I'm not going to strike it. Sorry. I'm not going to strike it.
> Prosecutor: I'll ask a more precise question.

{¶ 47} At this point, the prosecutor asked the detective, referring to the detective's supplemental report, whether the detective listened to "one of [Gilcrease's] call[s] on June 5th." Detective Reese replied, "I misunderstood you * * * I listened to his jail calls, several jail calls * * * and I listened to [Gilcrease] explain what he was going to do when he got out of jail * * * that he was going to get the guys who did this to him * * * that he was going to 'f*** one of them N's up when [he] get[s] out.'"

{¶ 48} Following this testimony, the defense moved for a mistrial, arguing that the prosecutor purposefully elicited improper testimony from the detective. In response, the prosecutor stated that he was not attempting to elicit improper testimony from the detective; rather, he was attempting to elicit the detective's testimony concerning his review of a jail call between Gilcrease and another individual on June 5. The prosecutor explained that the conversation between Detective Reese and Gilcrease occurred either in the evening of June 2 or the early morning hours of June 3, and the question he posed to the detective specifically referenced information the detective gleaned on June 5, which was the date Detective Reese reviewed the jail call.

{¶ 49} After hearing from both the defense and the prosecution, the court denied the motion for a mistrial. In so doing, the court stated that it is never pleased to hear "that somebody pleading the Fifth is going to change their analysis in the

case" and acknowledged that this type of statement "may ha[ve] an effect" on laypeople, but "it doesn't have an effect on me." The court explained:

> I understand what your client's constitutional rights are. And I understand that nobody can use that against him. * * * Let me be honest here. I don't really care about [the detective's] analysis of the case. * * * Nor do you want me to care about the analysis of case, correct? I'm the fact-finder.
> We're not dealing with a jury. We're not dealing with 12 laypeople. This officer is entitled to whatever opinion he wants about the investigation. And in the end it's my decision what the facts are, not his. And I can independently operate.
> And I'm fully aware and very protective of everybody's constitutional rights, regardless of where they sit in this room. So I don't think it [rises] to a mistrial * * *.

{¶ 50} The Fifth Amendment to the Constitution of the United States provides that no person "shall be compelled in any criminal case to be a witness against himself." This amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

{¶ 51} Evidence introduced by the state regarding the defendant's exercise of his right to remain silent violates the Due Process Clause of both the state and federal constitutions. *State v. McMiller*, 8th Dist. Cuyahoga No. 103962, 2016-Ohio-5844, ¶ 43, citing *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 18. "This rule enforces one of the underlying policies of the Fifth Amendment, which is to avoid having the jury assume that a defendant's silence equates with guilt." *McMiller*, citing *Leach* at ¶ 30, citing *Murphy v. Waterfront Comm. of N.Y. Harbor*, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

**{¶ 52}** In a bench trial, the court is presumed to know and follow the law unless the record affirmatively demonstrates to the contrary. *State v. Kilbane*, 8th Dist. Cuyahoga No. 106753, 2019-Ohio-863, ¶ 15; *State v. Willis*, 8th Dist. Cuyahoga No. 90956, 2008-Ohio-6156, ¶ 15 ("[I]n a bench trial, the court is presumed to have considered only the relevant, material, and competent evidence."). The United States Supreme Court has stated that

> [i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions. It is equally routine for them to instruct juries that no adverse inference may be drawn from a defendant's failure to testify; surely we must presume that they follow their own instructions when they are acting as factfinders.

*Harris v. Rivera*, 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981); *State v. Shropshire*, 8th Dist. Cuyahoga No. 103808, 2016-Ohio-7224, ¶ 38.

**{¶ 53}** Here, the detective's improper reference to Gilcrease's assertion of his Fifth Amendment right is arguably concerning. Because the matter was tried to the court, however, we can presume that the detective's statement did not infect the court's decision-making. And the court's explanation in denying the motion for mistrial supports this presumption. There is nothing in the record that demonstrates the court declined to ignore the improper statement.

**{¶ 54}** Furthermore, Gilcrease has not demonstrated that the detective's statement deprived him of a fair trial. Indeed, the record demonstrates that the court granted Gilcrease's Crim.R. 29 motion for dismissal of the felonious assault charges in Counts 5 through 10, which stem from the gas station shooting about

which the detective testified, and the aggravated murder charge in Count 14, which stems from the shooting on June 26. The court also found Gilcrease not guilty on Counts 15 through 18, which stem from the June 26 shooting.

{¶ 55} We therefore find that the trial court did not abuse its discretion in denying Gilcrease's motion for mistrial because "the ends of justice" did not "so require." *Franklin*, 62 Ohio St.3d at 127, 580 N.E.2d 1, citing *Somerville*, 410 U.S. at 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425. Gilcrease's first assignment of error is overruled.

## IV. Sufficiency of the Evidence

{¶ 56} In his second assignment of error, Gilcrease contends that the state failed to provide sufficient evidence to support his conviction of improperly discharging into a habitation (Counts 1 and 3) and discharging a firearm on or near prohibited premises (Counts 2 and 4) on May 14, 2017. Gilcrease argues that the evidence was insufficient to show that he was the person who committed the crimes, and even if the evidence established his identity as the shooter, the state presented no evidence of Gilcrease's mental state at the time of the shooting (as it pertains to Counts 1 and 3).

{¶ 57} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 58} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence, on the other hand, is evidence that requires "the drawing of inferences that are reasonably permitted by the evidence." *Id. See also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[c]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind"). Circumstantial and direct evidence are of equal evidentiary value. *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12. And in some cases, circumstantial evidence may be "'more certain, satisfying and persuasive than direct evidence.'" *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990),

quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 59} R.C. 2923.161(A)(1) provides that "[n]o person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm into an occupied structure that is a permanent or temporary habitation of any individual." R.C. 2923.162(A)(3) provides that "[n]o person shall * * * [d]ischarge a firearm upon or over a public road or highway."

{¶ 60} R.C. 2901.22(B) provides that a person acts "knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." This court has repeatedly held that "'shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, ¶ 38, quoting *State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419, ¶ 19, citing *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636 (1989); *see also State v. Ivory*, 8th Dist. Cuyahoga No. 83170, 2004-Ohio-2968, ¶ 6; *State v. Jordan*, 8th Dist. Cuyahoga No. 73364, 1998 Ohio App. LEXIS 5571 (Nov. 25, 1998).

{¶ 61} Here, the evidence shows that Gilcrease was in possession of a .40 caliber firearm on June 26, 2017, at the intersection of Wade Park and Ansel Road, and he discharged 14 rounds from this firearm that ultimately resulted in the death of Dominique Robinson. Additionally, officers recovered numerous .40 caliber

casings outside of Ms. Robinson's home on Maud Avenue, where Dominique also lived, and Ms. Alexander's nearby home on Simon Avenue. Officers also recovered multiple .40 caliber casings from the gas station shooting on June 3, 2017. Several of these casings were located in the vehicle in which Gilcrease was a passenger. The video surveillance of the gas station shooting shows Gilcrease firing a .4o caliber firearm and then handing the weapon to another individual before approaching police officers on the scene. The ballistics expert testified that all of the .40 caliber casings that were recovered from the shooting at the homes on Maud Avenue and Simon Avenue, the shooting at the gas station, and the homicide of Dominique Robinson at Wade Park and Ansel Road were fired from the same Smith & Wesson .40 caliber pistol. Moreover, the evidence shows that the victim of the Wade Park and Ansel Road shooting lived at the house on Maud Avenue, and a reasonable trier of fact could conclude this commonality of victims connected Gilcrease to the crimes.

{¶ 62} Construing this evidence in a light most favorable to the state, we find the state presented sufficient evidence from which a reasonable factfinder could infer that Gilcrease was the shooter on May 14, 2017, and he knowingly discharged a .40 caliber firearm into two residences (Counts 1 and 3), one of which was the home in which Dominique lived, and discharged the firearm on or near prohibited premises (Counts 2 and 4).

{¶ 63} Gilcrease's second assignment of error is overruled.

## V. Manifest Weight of the Evidence

{¶ 64} Gilcrease contends in his third assignment of error that his convictions were against the manifest weight of the evidence. A manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541. This challenge raises a factual issue:

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The use of the word "manifest" in the standard of review "means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence." *State v. Hernandez*, 8th Dist. Cuyahoga No. 106577, 2018-Ohio-5031, ¶ 20.

### Counts 1 through 4

{¶ 65} Gilcrease contends in his third assignment of error that his convictions pertaining to the shootings on Maud Avenue and Simon Avenue were against the manifest weight of the evidence. Advancing the same argument he presented in his previous assignment of error, Gilcrease contends that the state presented no evidence that he was the shooter (in Counts 1 through 4) and no

evidence of his state of mind during the commission of the offenses of May 14, 2017 (in Counts 1 and 3).

{¶ 66} We find nothing in the record from which to conclude that the trial court lost its way in weighing the evidence presented and created a manifest miscarriage of justice. The shootings at Ms. Robinson's home on Maud Avenue, where Dominique resided, and Ms. Alexander's home on Simon Avenue occurred on May 14. Officers recovered numerous .40 caliber casings near both homes — in the front yard, on the sidewalk, and in the street in front of the houses. Weeks later, on June 2, video surveillance at the Sunoco gas station captured Gilcrease discharging a .40 caliber firearm. The police recovered several .40 caliber casings from the gas station, including nine .40 caliber casings from the vehicle in which Gilcrease was a passenger during the gas station shooting. Another three weeks later, on June 26, Gilcrease discharged a .40 caliber pistol at the intersection of Wade Park and Ansel Road, purportedly in self-defense, killing Dominique. The police recovered fourteen .40 caliber casings from the scene at the intersection. The ballistics expert testified that the .40 caliber casings recovered from Maud Avenue, Simon Avenue, the gas station, and the intersection of Wade Park and Ansel Road were all fired from the same .40 caliber firearm.

{¶ 67} Although the state presented no eyewitness testimony concerning the shooting on Maud Avenue and Simon Avenue, we do not find that the lack of this testimony in this case necessitates a determination that this is the exceptional case in which the evidence weighs heavily against the conviction.

Count 19

{¶ 68}  Gilcrease also argues that his conviction of the June 26, 2017, shooting at Wade Park and Ansel Road, in Count 19, was against the weight of the evidence where the court accepted Gilcrease's self-defense claim in the shooting of Dominique but did not find he acted in self-defense in discharging his firearm on or near the prohibited premises.

{¶ 69}  In Count 19, Gilcrease was convicted of discharging a firearm on or over a public roadway in violation of R.C. 2923.162(A)(3).  The trial court found self-defense applicable to this charge yet determined that Gilcrease exceeded the force necessary to defend himself, stating that "there were a number of casings found away from the actual site of the two cars in this homicide" and Gilcrease "continu[ed] to shoot * * * in a place farther than where he needed * * *."

{¶ 70}  Gilcrease contends that the trial court properly permitted a claim of self-defense but argues that the evidence does not support the court's conclusion that he exceeded the force necessary to defend himself.

{¶ 71}  This court has held that R.C. 2923.162(A)(3) is a strict liability offense.  *State v. James*, 2015-Ohio-4987, 53 N.E.3d 770, ¶ 33 (8th Dist.) ("R.C. 2923.162(A)(3) is a statute intended to benefit the public good and thus imposes strict liability").  The law in this district is not settled, however, concerning whether self-defense is a defense to the strict liability crime of shooting on or over a

public roadway.[2]  Here, the trial court presumed that the defense is indeed available to such an offense, yet it determined that under the facts of this case, self-defense is not available.  Because we find the evidence supports the factfinder's conclusion that Gilcrease used more force than reasonably necessary in defending himself, we decline to address the general application of self-defense to the offense of shooting on or over a public roadway.

---

[2] In *State v. Porter*, 2016-Ohio-1115, 61 N.E.3d 589 (8th Dist.), this court affirmed the defendant's convictions for felonious assault and discharge of a firearm over a public roadway, finding the trial court's "arguably incomplete" self-defense instruction did not amount to plain error. The trial court in *Porter* declined to rule on whether the crime of shooting over a public roadway was a strict liability offense and it instructed the jury on self-defense regarding the felonious assault charges yet refused to instruct the jury on self-defense concerning the defendant's charge of shooting over a public roadway. *Id.* at ¶ 87.  On appeal, without addressing the applicability of self-defense to the charge of shooting over a public roadway, this court found that R.C. 2923.162(A)(3) is a strict liability offense and therefore the defendant "was not entitled to a default jury instruction * * * on recklessness."  *Id.* at ¶ 62.  The dissent, however, would find that the trial court erred in failing to instruct the jury on self-defense on the crime of shooting over a public roadway, stating that

> because self-defense has been recognized as a defense to the strict liability crime of having a weapon while under disability, it would also be a defense to the crime of shooting over a roadway. Both crimes are meant to protect the public from harm, yet courts understand — at least in the case of the weapon while under disability charge — that a person has the right to defend himself without incurring criminal charges for the conduct, when self-defense necessitates the would-be criminal conduct.  *See* [*State v. Patton*, 106 Ohio App.3d 736, 739, 667 N.E.2d 57 (1st Dist.1995)]. This is precisely what the Ninth District meant in [*State v.*] *Henley*, 138 Ohio App.3d 209, 740 N.E.2d 1113 (9th Dist.2000), when it stated that it would be an inane legal paradox to hold that a person cannot act in self-defense, for fear of being charged with a crime, when the person's actions are so "intertwined with the attack necessitating self-defense."

*Id.* at ¶ 93.

{¶ 72} In Ohio, self-defense is an affirmative defense and the defendant bears the burden of establishing by a preponderance of the evidence that he is entitled to the defense.[3] R.C. 2901.05(A); *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990); *Kilbane*, 8th Dist. Cuyahoga No. 106753, 2019-Ohio-863, at ¶ 12, 13. To establish self-defense through the use of deadly force, a defendant must demonstrate that (1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape from such danger was the use of such force, and (3) he must not have violated any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. If the defendant fails to prove any one of these elements, he has failed to prove he acted in self-defense. *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

{¶ 73} Regarding the amount of force that is permitted, the defendant "is privileged to use that force that is necessary to repel the attack." *Williford* at 249. Where, however, the amount of force used "is so disproportionate that it shows an 'unreasonable purpose to injure,' the defense of self-defense is unavailable." *State v. Macklin*, 8th Dist. Cuyahoga No. 94482, 2011-Ohio-87, ¶ 27, quoting *State v. Speakman*, 4th Dist. Pickaway No. 00CA035, 2001-Ohio-2437, 13; *State v.*

---

[3] We note that the General Assembly amended R.C. 2901.05, effective March 28, 2019, where the statute now places the burden of proof of self-defense on the state. *State v. Bouie*, 8th Dist. Cuyahoga No. 108095, 2019-Ohio-4579, ¶ 37, fn.2. This amendment, however, was not in effect at the time of Gilcrease's trial.

*Hendrickson*, 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 33, quoting *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002-Ohio-415, 3 ("Self-defense * * * is inappropriate if the force used is 'so grossly disproportionate as to show revenge or as [a] criminal purpose.'").

{¶ 74} Here, the evidence shows that two separate clusters of spent casings were recovered from the intersection of Wade Park and Ansel Road. The first cluster of nine casings was located at the intersection. Detective Peoples testified that the second cluster of five casings was discovered "across the street" from the original group of nine casings. The evidence also shows that the two vehicles involved in the shooting — one containing Dominique and one containing Gilcrease — sped off in different directions, and the vehicle in which Dominique was a passenger contained a bullet hole in its trunk.

{¶ 75} In light of the foregoing, we cannot find the trial court lost its way and created such a manifest miscarriage of justice in concluding that Gilcrease exceeded the force necessary to repel the initial attack. The factfinder could reasonably believe that the defendant was initially justified in shooting Dominique but his actions were no longer justified where he continued shooting at a vehicle that was purportedly fleeing the scene and was therefore no longer a threat. Thus, self-defense would not be available to Gilcrease for discharging a firearm over a public roadway on June 26, 2017. This is not the exceptional case in which the evidence weighs heavily against Gilcrease's conviction in Count 19.

{¶ 76} Gilcrease's third assignment of error is overruled in its entirety.

## VI. Consecutive Sentences

**{¶ 77}** In his final assignment of error, Gilcrease contends that the court's imposition of consecutive sentences was not supported by the record.

**{¶ 78}** We review felony sentences under the standard of review set forth in R.C. 2953.08(G)(2). *State v. Cedeno-Guerrero*, 8th Dist. Cuyahoga No. 108097, 2019-Ohio-4580, ¶ 17; *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or otherwise modify a sentence, or vacate a sentence and remand for resentencing if it "clearly and convincingly finds" that the record does not support the sentencing court's findings under R.C. 2929.13(B) or (D), 2929.14(B)(2)(e) or (C)(4), or 2929.20(I), or the sentence is otherwise contrary to law.

**{¶ 79}** A consecutive sentence may therefore be challenged two ways:

> First, the defendant can argue that consecutive sentences are contrary to law because the court failed to make the necessary findings required by R.C. 2929.14(C)(4). * * * Second, the defendant can argue that the record does not support the findings made under R.C. 2929.14(C)(4).

*State v. Johnson*, 8th Dist. Cuyahoga No. 102449, 2016-Ohio-1536, ¶ 7.

**{¶ 80}** Before imposing consecutive sentences, a trial court must make the findings mandated by R.C. 2929.14(C)(4). *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. And the failure to make the findings renders the imposition of consecutive sentences contrary to law. *State v. Gohagan*, 8th Dist. Cuyahoga No. 107948, 2019-Ohio-4070, ¶ 29. In making the consecutive sentence findings, a trial court is not required to state its reasons for imposing consecutive

sentences, nor is it required to give a verbatim recitation of the language of R.C. 2929.14(C). *Bonnell* at ¶ 27, 29. Rather, "as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 81} R.C. 2929.14(C)(4) provides that the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender, that such sentences would not be disproportionate to the seriousness of the conduct and to the danger the offender poses to the public, and that one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 82} Here, Gilcrease concedes that the trial court made the statutorily mandated findings. He argues, however, that the record does not support the findings, claiming that the trial court's only analysis concerning consecutive sentences is the recitation of the statutory language.

{¶ 83} When examining whether the record supports the trial court's consecutive sentence findings, support for the court's findings is not confined to the trial court's comments at sentencing but rather may appear anywhere in the record. *State v. Johnson*, 2018-Ohio-3670, 119 N.E.3d 914, ¶ 52 (8th Dist.); *State v. Gatewood*, 8th Dist. Cuyahoga No. 101271, 2015-Ohio-1288, ¶ 13, citing *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 20-22 (8th Dist.).

{¶ 84} In this case, the record demonstrates that Gilcrease was convicted of multiple offenses arising from four separate incidents on three different dates in which Gilcrease fired shots into two homes and over a public roadway. Although the trial court acknowledged that Gilcrease shot Dominique in self-defense, the court noted that Gilcrease's conduct demonstrated a disregard for life and instilled fear in the public. And the court recognized that the community, particularly the children, would not be safe from drive-by shootings or street shootings while walking to school if this type of behavior continued without regard for consequences. The court also heard from the victims and how the shootings impacted their lives. Finally, the court noted that Gilcrease was presently "serving time" on another matter.

{¶ 85} In light of the above, we cannot "clearly and convincingly" find that the record does not support consecutive-sentence findings. Gilcrease's final assignment of error concerning consecutive sentences is overruled.

{¶ 86} We find error, however, with respect to the sentence in Count 13, carrying a concealed weapon. Although the trial court's sentencing entry states that the court imposed a sentence of 15 months on this count, there is no evidence in the

sentencing transcript that the trial court imposed a sentence on this count in open court. Because the journal entry must reflect what actually occurred at sentencing, we remand the case for the limited purpose of the trial court imposing sentence on Count 13. *State v. Stafford*, 8th Dist. Cuyahoga No. 104276, 2016-Ohio-5635, ¶ 16, citing *State v. Jones*, 8th Dist. Cuyahoga No. 94408, 2011-Ohio-453, ¶ 15 ("A variance between the sentence pronounced in open court and the sentence imposed by a court's judgment entry requires a remand for sentencing.").

{¶ 87} Judgment affirmed in part, vacated in part, and remanded.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

SEAN C. GALLAGHER, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR