[Cite as *State v. Ratliff*, 2023-Ohio-1970.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,          :

                       No. 111874

    v.                           :

TEVIN RATLIFF,                    :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 15, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652749-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Jeffrey S. Schnatter and Poula E. Hanna, Assistant Prosecuting Attorneys, *for appellee*.

Charles Ruiz-Bueno Co., LPA, and J. Charles Ruiz-Bueno, *for appellant*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Tevin Ratliff ("Ratliff"), appeals his convictions and claims the following errors:

> 1. The trial court erred when it denied the defendant-appellant's request to instruct the jury on self-defense.

2. The trial court erred when it denied the defendant-appellant's request to instruct the jury on the lesser included offense of involuntary manslaughter.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Ratliff was charged with one count of aggravated murder in violation of R.C. 2903.01(A); one count of felony murder in violation of R.C. 2903.02(B); and one count of felonious assault in violation of R.C. 2903.11(A)(1), in connection with the shooting death of Samuell Bell ("Sam") on August 23, 2020. All counts included one- and three-year firearm specifications pursuant to R.C. 2941.141(A) and 2941.145(A).

{¶ 4} Following discovery and several pandemic-related delays, the case proceeded to a jury trial in July 2022. Courtney Jones ("Jones"), an eyewitness to the shooting, testified that she and Sam began dating shortly after graduating from high school in 2012. They had a child together a few years later. In 2017, before the child was born, Sam was convicted of a robbery offense and was sentenced to three years in prison.

{¶ 5} In 2019, while Sam was incarcerated, Jones decided to move to Texas to live with her mother. She met Ratliff shortly before moving to Texas, and Ratliff drove Jones to Texas with her luggage. Ratliff found employment in Louisiana and continued to visit Jones once or twice a week. Ratliff "showered" Jones with gifts of flowers and jewelry. (Tr. 449.) Jones testified that she discouraged Ratliff from moving to Texas. She believed that Ratliff was more interested in her than she was

in him. (Tr. 451.) And, while Jones maintained a casual relationship with Ratliff, she continued to communicate with Sam while he was in prison. According to Jones, whenever she told Ratliff about her continued relationship with Sam, he became "irate." (Tr. 453.)

{¶ 6} Sam was released from prison in May 2020. Jones wanted to try to build on her relationship with Sam because he was the father of her child. She, therefore, decided to move to Cleveland and, in August 2020, Ratliff once again drove her there. (Tr. 454-455.) Although Jones had sexual relations with Ratliff in the past, she was not intimate with him from May to August 2020. (Tr. 458.) However, after Jones moved back to Cleveland, Sam went out with another woman two days before the shooting. (Tr. 461-462.) Jones felt "miserable" and called Ratliff, and they had sex on Friday August 21, 2020.

{¶ 7} Two days later, on Sunday August 23, 2020, Sam called Jones and invited her to a party, and Jones went with him. After the party, Jones went with Sam to his niece's house where he was living and they decided to have sex. However, during the party and after they arrived at Sam's niece's house, Ratliff continually called and texted Jones's phone. Jones testified that she neither answered the phone nor responded to the text messages. Ratliff called Jones on FaceTime just as she and Sam were about to have sex. Sam, apparently annoyed by the incessant calling, answered the FaceTime call. According to Jones, Sam told Ratliff: "What's the issue? I don't see why you keep calling her, she doesn't want to talk to you." (Tr. 466.) Sam ended the call, but Ratliff immediately called again on FaceTime. Sam

answered the phone and told him: "You know she doesn't want to be with you. So I think you should let this go." (Tr. 466.) Thereafter, Sam again ended the call.

{¶ 8} Jones and Sam turned their attention to their relationship and discussed their future as a family. Meanwhile, Ratliff continued to text Jones. Ratliff eventually told them that he was outside the house and told Jones and Sam to "[c]ome outside." (Tr. 479.) Sam reminded Jones that he had recently been released from prison, did not want to go back to prison and, therefore, "didn't want any issues." (Tr. 481.) Jones's cell-phone records, which were admitted into evidence at trial, show that Ratliff repeatedly called on FaceTime and texted messages saying, "Come out." (Tr. 481-483.) Jones testified that when she answered one of the calls, Ratliff was "screaming and hollering into the phone." (Tr. 484.)

{¶ 9} Jones again ended the call and her cell-phone records show that Ratliff continued calling repeatedly for several minutes. At 9:22:54 p.m., Ratliff sent a text stating, "Do you want me to come through the front door or come round back?" (Tr. 486.) This text was followed by several more unanswered FaceTime calls. At 9:43:12 p.m. and again at 9:46:15 p.m., Ratliff texted: "Come out." (Tr. 489-490.) These messages were again followed by several more unanswered FaceTime calls. At 9:51:10 p.m., Ratliff texted, "Send em out." (Tr. 491.) Jones believed the message was an attempt to get Sam outside. (Tr. 491.) When asked how Sam reacted to the command to come outside, Jones explained that Sam was not scared of Ratliff, but he was trying to avoid a confrontation. (Tr. 491-492.)

**{¶ 10}** After the last text, Jones went out onto the front porch and observed Ratliff in the driver's seat of a Jeep Cherokee parked across the street. An unidentified person was seated in the passenger's side of the vehicle. Jones identified Ratliff to Sam, who was still inside the house in the living room. Jones approached her car, which was parked in the driveway. She explained:

> I'm walking to my car, Tevin gets out of his car. When he gets out of his car, whoever is in that passenger seat went to the driver seat. Tevin walked up to me and was giving me various curses.

(Tr. 497.) Ratliff walked up to Jones and ripped a necklace off of her neck. Meanwhile, Sam came out of the house and walked up behind Jones. Jones testified that at that moment, Ratliff pointed a gun at them and told Jones to get out of the way. (Tr. 498.) Jones explained:

> A: * * * Tevin is pointing the gun close to me.
>
> Q: How close is he to you?
>
> A: He's like close to where I can see the barrel.
>
> Q: Within a foot, within 12 inches?
>
> A: Correct.
>
> Q: What is happening?
>
> A: He keeps telling me to move out of the way. Sam is behind me. I say, "No."
>
> He told me to move again, I said, "Go home." And then a shot rang out. And Sam and I began running.
>
> Q: Where did the shot ring out from?
>
> A: From his gun. It looked like a firecracker.

* * *

Q: Could you see a muzzle flash?

A: I seen a firecracker of Tevin's gun, and I started running.

* * *

Q: What, if anything do you see happening with Sam?

A: I hear a bunch of gunshots, and I see Sam running basically, for his life.

Q: At some point in time, did something happen to make you believe Sam had been hit?

A: As we were running, he made a noise like an agony, like, "Ahh," and fell.

(Tr. 498-499.) Sam collapsed into a fence in a neighbor's yard. He fell onto his side, and Jones attempted to pull him up but was unsuccessful. Jones explained:

I was telling him to get up, "We go to get up. He's chasing us, we got to get up."

Shortly after that, Tevin,—I could hear footsteps coming around. Tevin shot him twice in the chest.

(Tr. 501.) Jones testified that Sam did not have a gun during the incident:

Q: When Sam came outside, did you [sic] Sam with a gun?

A: No.

Q: When Sam was running, and Tevin was shooting, did you see a gun in Sam's hand?

A: No.

Q: When Sam was lying on the ground getting shot that final time, did you see a gun?

A: No.

Q: Did you ever see a gun near Sam, other than the one Tevin was pointing at him?

A: No.

Q: How close was Tevin to Sam when he shot him that last time?

A: Standing over him.

Q: Right next to him?

A: Yeah.

(Tr. 503.)

{¶ 11} Sam's niece, Areia Bell ("Areia"), testified that Sam came to live with her in her home on East 135th Street in Cleveland after he was released from prison in May 2020. On August 23, 2020, Areia spent the day with her friend Shellie Wright ("Wright"), and they returned to her house at approximately 9:00 p.m. Sam and Jones were in the bedroom at that time, but they came out shortly thereafter. Ariea testified that Jones decided to leave the house to pick up her and Sam's daughter. Jones asked Wright to move her car because it was blocking Jones's car in the driveway. Shortly after Jones and Wright went outside, Areia heard yelling followed by gunshots. Thereafter, Wright burst back into the house screaming, "He's shooting at Sam." (Tr. 628.)

{¶ 12} Areia is a licensed gun owner and owns two identical Smith & Wesson M & P Shields. (Tr. 620, 639.) Areia testified that she grabbed one of her guns and

stepped out onto the porch. Wright identified Ratliff as the person who was shooting at Sam, and Areia "opened fire as he was running across the street." (Tr. 629.) Areia could see Ratliff's gun in his hand, and she fired eight bullets in his direction. (Tr. 631.) Areia ran out of bullets and went back inside the house to reload. While she and Wright were reloading, they heard Jones screaming in the yard next door and went outside to investigate. Jones was giving CPR to Sam, who was lying on the neighbor's fence. Areia called 911, and when the police arrived, Areia told them that Sam did not have a gun during the incident. (Tr. 654.) She also reported that she had two guns and that she fired shots at Ratliff because he was shooting Sam. (Tr. 639.)

{¶ 13} Wright testified at trial and confirmed that she observed Ratliff "opening fire" at Sam when she went outside to move her car. According to Wright, Jones and Sam took off running as soon as Ratliff started shooting. (Tr. 751-752.) Wright observed Ratliff running toward the Jeep after the shooting, and she heard the Jeep "peel off." (Tr. 756.) Wright told police that Sam did not have a gun during the incident. (Tr. 763.)

{¶ 14} Kristen Koeth ("Koeth"), a firearms examiner with the Cuyahoga County Forensic Science Laboratory, testified that she examined the bullets and shell casings found at the scene of the shooting. All of the bullets found at the scene were the same caliber. She explained, however, that microscopic marks and other individual characteristics observed on the casings and bullets are specific to each individual firearm. (Tr. 917-918.) After examining the bullets and shell casings,

Koeth concluded that two firearms were used in the incident. (Tr. 918, 920.) Koeth explained that both firearms left "good marks" that could be used for comparison. (Tr. 921.) All of the shell casings discharged from Areia's gun were found on the front porch and the porch step of her house. The shell casings from the other weapon were found throughout the yard.

{¶ 15} Dr. Elizabeth Mooney ("Dr. Mooney"), a deputy forensic pathologist in the Cuyahoga County Medical Examiner's Office, performed the autopsy of Sam's body. She testified that Sam sustained 14 gunshot wounds from 13 gunshots. One wound struck Sam's spine at the base of the skull and would have rendered him a quadriplegic had he survived. Some gunshots entered Sam's body through the back and others entered through the front and side. One gunshot appeared to have been fired while Sam was lying on the pavement from a person standing over his body because the bullet struck the pavement and prevented it from exiting Sam's body. (Tr. 675.)

{¶ 16} Ratliff testified in his own defense at trial. He acknowledged that he was initially angry when Jones informed him that she wanted to get back together with Sam but stated that he "accepted everything" and thereafter maintained "an open relationship." (Tr. 1001.) He also confirmed that Jones slept with him on the Friday night before the shooting because Sam was with another woman. However, she and Ratliff argued on Saturday because Jones claimed that he owed her money for "weed," and he wanted her to return a necklace and bracelet he had given her. He also demanded that she return a set of keys to his apartment. (Tr. 1006, 1009.)

{¶ 17} Ratliff testified that he ultimately came to Areia's house on the night of August 23, 2020, to recover the necklace, bracelet, and keys that Jones promised to return to him. Ratliff acknowledged the cell-phone records showing that he repeatedly called and texted Jones on the night of the shooting. He confirmed that most of his calls went unanswered but testified that he received a FaceTime call from Jones's phone shortly before he arrived at the house. According to Ratliff, Sam was on the phone asking Ratliff why he was calling Jones. Ratliff testified that during the brief FaceTime call, Sam "turned the camera around and showed [him] his manhood wrapped in protection." (Tr. 1008.) He then turned the camera on Jones, who was "bent over the bed" before ending the call.

{¶ 18} When Ratliff arrived at the house, Jones, Wright, and Sam came out onto the porch. Ratliff testified that Jones approached Ratliff's car and he asked for his things. While he and Jones were conversing, Sam approached with a gun in his hand. (Tr. 1015.) According to Ratliff, Sam brandished the gun, chambered a round, and "peacocked it," because he wanted Ratliff to see it. (Tr. 1016.)

{¶ 19} Jones removed the necklace from her neck and the bracelet from her wrist and threw them on the grass with his keys. As Ratliff moved to pick them up, he noticed Sam making a hand gesture as if he were shooting a gun. Ratliff believed that because he did not respond to the threat, Sam pulled out the real gun, pointed it at him, and said, "What's up, little ni—a?" (Tr. 1020.) Ratliff was scared, dropped the necklace, and backed up to his car. Ratliff tried to open the door, but the doors

were locked. His cousin, who was seated in the driver's seat, unlocked the doors, and Ratliff walked around and opened the passenger-side door. (Tr. 1023.)

{¶ 20} According to Ratiff, Jones started to cry and Sam approached Ratliff's car with his gun in his pocket. Ratliff "waved him off" in an attempt to avoid a conflict, and Jones told Sam to go back in the house. Ratliff testified that as he was backing up to the car, he turned his head to see how much distance there was to the car, and he heard the first gunshot. (Tr. 1027.) Ratliff responded by firing two shots. Ratliff testified that as he ran to his right, he heard two more shots and fell to the ground because he had been hit. He testified that he felt he was "losing the fight." From the ground he observed Jones and Sam running toward him so he got up and started shooting Sam. (Tr. 1031, 1104.) Ratliff explained that he finally escaped when Sam stopped shooting. (Tr. 1031.)

{¶ 21} On cross-examination, Ratliff acknowledged several messages he sent that stated, "Come out," and "Send em out," but asserted the messages were directed at Jones, not Sam. He also conceded that he sent a text message asking, "You want me to come through the front door or the back?" but asserted that he was not threatening to go into the house. (Tr. 1063) Ratliff further stated that Sam was standing at the corner of the house the last time Ratliff shot him, and he did not see how Sam got to the neighbor's fence where he was later found. However, he did not dispute Dr. Mooney's testimony that the gunshot to Sam's spinal cord would have rendered him a quadriplegic. (Tr. 1111-1112.)

{¶ 22} Ratliff requested a jury instruction on self-defense. After hearing arguments from both sides, the court denied the request. Ratliff also requested a charge on the lesser-included offense of involuntary manslaughter, which was also denied. The jury acquitted Ratliff of the aggravated murder charge but found him guilty of murder and felonious assault and the accompanying firearm specifications. The murder and felonious assault charges merged for sentencing purposes and the state elected to sentence on the murder conviction. The trial court sentenced Ratliff to a mandatory 15-years to life on the murder conviction to be served consecutive to three-years on the attendant gun specifications for an aggregate life sentence with parole eligibility after 18 years. This appeal followed.

## II. Law and Analysis

### A. Self-Defense

{¶ 23} In the first assignment or error, Ratliff argues the trial court erred in refusing to provide a jury instruction on self-defense.

{¶ 24} We review a trial court's refusal to give a particular jury instruction for an abuse of discretion. *State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 30 (8th Dist.), citing *State v. Leonard*, 8th Dist. Cuyahoga No. 98626, 2013-Ohio-1446, ¶ 33. An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse "'implies that the court's attitude is unreasonable, arbitrary or

unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 25} A requested jury instruction should be given if it contains a correct statement of the law, is appropriate to the facts, and reasonable minds might reach the conclusion sought by the instruction." *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991); *State v. Nelson*, 36 Ohio St.2d 79, 303 N.E.2d 865 (1973), paragraph one of the syllabus. However, the trial court should not instruct the jury where there is no evidence to support a particular issue. *State v. Williams*, 8th Dist. Cuyahoga No. 95748, 2011-Ohio-5385, ¶ 32, citing *Riley v. Cincinnati*, 46 Ohio St.2d 287, 348 N.E.2d 135 (1976).

{¶ 26} R.C. 2901.05(B)(1) governs self-defense and states, in relevant part:

> A person is allowed to act in self-defense * * * . If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense * * *, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense[.]

Thus, the defendant bears the initial burden of production, which is the burden of producing evidence "that tends to support" that the defendant used the force in self-defense. *State v. Davidson-Dixon*, 2021-Ohio-1485, 170 N.E.3d 557, ¶ 18 (8th Dist.). If the defendant meets his or her initial burden of producing evidence tending to support a claim of self-defense, the burden then shifts to the state to establish its burden of persuasion to prove beyond a reasonable doubt that the defendant did not use force in self-defense. *Id.*

{¶ 27} A person may use deadly force in self-defense where he or she (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 14, citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). To satisfy this burden of proving beyond a reasonable doubt that the defendant did not use force in self-defense, the state must disprove at least one of the elements of self-defense. *Davidson-Dixon* at ¶ 18.

{¶ 28} In deciding whether a self-defense instruction should be given, the trial court must view the evidence in a light most favorable to the defendant without regard to credibility. *Id.* at ¶ 20. If there is conflicting evidence on the issue of self-defense, the instruction must be given to the jury. *Id.* However, "'if the evidence generates only a mere speculation or possible doubt, the evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted.'" *Id.*, quoting *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978).

{¶ 29} Undisputed evidence shows that Ratliff was at fault in creating the situation giving rise to the affray. He repeatedly called and texted Jones's phone but she mostly ignored him, implicitly sending the message that she did not want to talk to him. In the brief exchanges during which Jones and Sam communicated with Ratliff, they told him to stay away. Sam told Ratliff, "She does not want to talk to

you" and "I think you should let this go." (Tr. 466.) Ratliff disregarded these messages and came to the house with a loaded weapon where he spent almost an hour imploring Jones and Sam to come out of the house.

{¶ 30} Ratliff also violated a duty to retreat after he created the affray. Pursuant to R.C. 2901.09(B), a defendant does not have a duty to retreat as long as the defendant is in a place in which he or she lawfully has a right to be. In this case, however, Ratliff was a trespasser. A trespasser is defined, in relevant part, as "[s]omeone who commits a trespass; one who intentionally and without consent or privilege enters another's property." *Black's Law Dictionary* (11th Ed.2019). As previously stated, Sam and Jones repeatedly told him not to come to the house and once he arrived at the house, they told him to leave. Ratliff admitted that when Sam made threatening hand gestures at him, he was standing next to the open, passenger-side door of his car while Sam was still on the porch. (Tr. 1023.) Indeed, Ratliff admitted the car was running and his cousin was ready to drive away. (Tr. 1023-1024.) However, instead of leaving and avoiding the conflict, he remained on the property and adopted a fighting stance. (Tr. 1027.)

{¶ 31} Moreover, Ratliff used more force than necessary to defend himself. "Implicit in th[e] second element of self-defense, i.e. that the defendant's use of deadly force was in 'good faith,' is the requirement that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *State v. Hendrickson*, 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 31. Accordingly, this court has held that the force used to defend must be at once

objectively reasonable and necessary under the facts and circumstances of the case. *State v. Johnson*, 8th Dist. Cuyahoga No. 110673, 2022-Ohio-2577, ¶ 15, citing *State v. Zafar*, 10th Dist. Franklin No. 19AP-255, 2020-Ohio-3341, ¶ 52-53, quoting *Martin v. Cent. Ohio Transit Auth.*, 70 Ohio App.3d 83, 93, 590 N.E.2d 411 (10th Dist.1990)("The force used to defend must be objectively necessary and reasonable under the facts and circumstances of the case and in view of the danger apprehended.").

{¶ 32} Forensic evidence established that Ratliff shot Sam repeatedly while he was running away. Sam sustained gunshot wounds that entered through his back, indicating he was running away from Ratliff when he was shot. Indeed, when asked what Sam was doing while Ratliff was shooting, Ratliff replied, "Getting shot I guess." (Tr. 1105.) Forensic evidence also showed that Sam was shot 13 times including once in the spinal cord. As previously stated, the spinal cord injury rendered Sam a quadriplegic. Ratliff offered no evidence to refute this forensic evidence.

{¶ 33} Viewing the evidence in a light most favorable to Ratliff, the evidence does not support a self-defense claim. To the contrary, the evidence demonstrates that Ratliff caused the affray, violated a duty to retreat, and used excessive force to defend himself. Therefore, the trial court reasonably concluded that the record did not support a self-defense claim and properly refused to provide a self-defense instruction.

{¶ 34} The first assignment of error is overruled.

## B. Lesser-Included Offense

{¶ 35} In the second assignment of error, Ratliff argues the trial court abused its discretion by refusing to provide a jury instruction on the lesser-included offense of involuntary manslaughter.

{¶ 36} Trial courts have broad discretion to determine whether sufficient evidence has been established to warrant a jury instruction on a lesser-included offense. *State v. Henderson*, 8th Dist. Cuyahoga No. 89377, 2008-Ohio-1631, ¶ 10. We, therefore, will not disturb the trial court's decision denying a request for a lesser-included-offense instruction absent an abuse of discretion. And, as previously stated, a trial court should not provide an instruction unless there is evidence to support the particular issue. *Murphy*, 61 Ohio St.3d at 591, 575 N.E.2d 828 (1991); *Williams*, 8th Dist. Cuyahoga No. 95748, 2011-Ohio-5385, at ¶ 32.

{¶ 37} The question of whether a particular offense should be submitted to the factfinder as a lesser-included offense involves a two-tiered analysis. *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense." *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6, citing *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987).

{¶ 38} The second tier requires the court to review the evidence and determine whether "'a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'"

*Evans* at ¶ 13, quoting *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, ¶ 11. "Only in the second tier of the analysis do the facts of a particular case become relevant." *Deanda* at ¶ 6.

{¶ 39} With respect to the first tier, the Ohio Supreme Court has held that involuntary manslaughter is a lesser included offense of murder. *State v. Kidder*, 32 Ohio St.3d 279, 282, 513 N.E.2d 311 (1987), citing *State v. Jenkins*, 15 Ohio St.3d 164, 218, 357, 473 N.E. 2d 274 (1984); R.C. 2903.02, R.C. 2903.04. *See also State v. Thomas*, 40 Ohio St.3d 213, 215, 533 N.E.2d 286 (1988) (holding that involuntary manslaughter is a lesser included offense of murder).

{¶ 40} With respect to the second tier, the Ohio Supreme Court has held that a trial court "must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense." *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, ¶ 34. We must, therefore, look to the evidence in this case and determine whether the "'jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'" *Evans* at ¶ 13, quoting *Mosely* at ¶ 11.

{¶ 41} Ratliff was convicted of felony murder in violation of R.C. 2903.02(B), which states that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

{¶ 42} R.C. 2903.04, referenced in R.C. 2903.02(B), governs involuntary manslaughter and provides, "No person shall cause the death of another or * * * as a proximate result of the offender's committing or attempting to commit a felony." The language of the statute defining involuntary manslaughter is almost identical to the language defining felony murder under R.C. 2903.02(B), except that R.C. 2903.04 "expands the definition to include any felony offense instead of limiting the predicate crime to a first- or second-degree felony." *State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5241, ¶ 20.

{¶ 43} Felonious assault was the predicate offense of violence referenced in the felony murder charge alleged in Count 2 of the indictment. Count 3 of the indictment set forth a charge of felonious assault in violation of R.C. 2903.11(A)(1). Because felonious assault is a second-degree felony and an offense of violence, it can serve as the underlying offense to a felony murder conviction. *State v. Blanton*, 2d Dist. Montgomery No. 29451, 2023-Ohio-89, ¶ 31, citing R.C. 2903.11(D) and 2901.01(A)(9)(a). In *Blanton*, the Second District explained that

> "if 'felonious assault is the underlying offense that causes the death of [a person], [then] felony murder is the proper charge,' and in such a case, a trial court does not err by refusing to charge a jury on involuntary manslaughter."

*Id.* at ¶31, quoting *State v. Lynch*, 2d Dist. Montgomery No. 27620, 2018-Ohio-1424, ¶ 26, quoting *State v. Brundage*, 1st Dist. Hamilton No. C-030632, 2004-Ohio-6436, ¶ 12. Accord *State v. Turner*, 2d Dist. Clark No. 2017-CA-78, 2019-Ohio-144, ¶ 41.

{¶ 44} Indeed, as previously stated, a lesser-included-offense instruction is only warranted if the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense. *Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, at ¶ 34. The evidence in this case does not support an acquittal on the felony murder charge.

{¶ 45} To prove felonious assault in violation of R.C. 2903.11(A)(1), the state had to prove that Ratliff knowingly caused serious physical harm to Sam. Undisputed evidence established that Ratliff caused serious physical harm (death) to Sam by shooting him multiple times with a firearm. Indeed, the jury found Ratliff guilty of felonious assault, the predicate offense to felony murder. It was, therefore, impossible for the jury to find Ratliff not guilty of felony murder but guilty of involuntary manslaughter based on the evidence presented in this case.

{¶ 46} Accordingly, the second assignment of error is overruled.

{¶ 47} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
MARY J. BOYLE, J., CONCUR