[Cite as *State v. Davis*, 2025-Ohio-5412.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,            :

                            No. 114872

    v.                             :

IMAN DAVIS,                                :

    Defendant-Appellant.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 4, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-682767-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Timothy Troup and Eben McNair, Assistant Prosecuting Attorneys, *for appellee*.

Russell S. Bensing, *for appellant*.

---

DEENA R. CALABRESE, J.:

{¶ 1} On December 13, 2024, a Cuyahoga County jury found defendant-appellant Iman Davis ("appellant") guilty of murder, discharge of a firearm on or near prohibited premises, two counts of felonious assault, tampering with evidence, and obstructing official business. The trial court entered judgment in accordance

with the jury's verdict and imposed a prison term.  Appellant timely appealed, arguing that the trial court erred by giving the jury a flight instruction and that his conviction was against the manifest weight of the evidence as to his right to self-defense.  Finding no merit to the appeal, we affirm.

## I. Procedural History and Relevant Facts

### A. Background, Indictment, and Notice of Self-Defense

{¶ 2} This case involves a fatal shooting that occurred on January 13, 2022, on Continental Avenue in Cleveland, Ohio.  Appellant, then 17 years old, was purchasing marijuana from the driver of a stopped car in an arranged transaction.  While appellant was completing the purchase at the driver's window, the victim, who was 16, exited the rear passenger door of the car.  Appellant fired his Glock semiautomatic pistol six times, striking the victim in the head with a single bullet.  The victim succumbed to his injuries several days later.

{¶ 3} Following a hearing in juvenile court, the case was bound over to the general division.  On July 14, 2023, the Cuyahoga County Grand Jury issued an eight-count indictment charging appellant with the following offenses:

Count 1:  murder, in violation of R.C. 2903.01(A);

Count 2:  murder, in violation of R.C. 2903.01(B);

Count 3:  discharge of a firearm on or near prohibited premises, in violation of R.C. 2923.162(A)(3);

Count 4:  felonious assault, in violation of R.C. 2903.11(A)(1);

Count 5:  felonious assault, in violation of R.C. 2903.11(A)(2);

Count 6:  tampering with evidence, in violation of R.C. 2921.12(A)(1);

Count 7: obstructing official business, in violation of R.C. 2921.31(A); and

Count 8: intimidation of crime victim or witness, in violation of R.C. 2921.04(B)(2).

{¶ 4} Counts 1-6 carried one-year firearm specifications pursuant to R.C. 2941.141(A). Counts 1-5 carried three-year firearm specifications pursuant to R.C. 2941.145(A).

{¶ 5} On October 16, 2023, appellant filed a notice of self-defense pursuant to Crim.R. 12.2.

**B. The Trial**

{¶ 6} Following pretrial proceedings and discovery, the case proceeded to a jury trial beginning December 4, 2024. The jury heard testimony that on January 13, 2022, Cleveland police responded to Continental Avenue in response to a call reporting that a male had been shot. Officer Ashley Santa testified that she arrived at the scene and observed Cleveland EMS personnel already present and attempting to save the victim's life. Officer Santa observed a black Dodge Charger at the scene, as well as several spent shell casings, a bloody towel, and a cell phone.

{¶ 7} EMS responder Erin Luciana testified that she and her partner found the victim face down, with a gunshot wound to the top of his head. (Tr. 633.) Luciana's report noted "active bleeding and brain matter present." (Tr. 638.) EMS rolled the victim onto his back, attempting to "manage[] the bleeding coming from [the victim's] head" and "move him into the ambulance as quickly as [they] could." (Tr. 622-623.) The victim was "conscious, but non-verbal." (Tr. 629.) EMS

transported him to Rainbow Babies and Children's Hospital. Questioned as to the victim's clothing, Luciana testified she saw nothing remarkable, i.e., "[n]othing outstanding other than typical like shirt, pants." (Tr. 625.) She specifically testified she did not recall the victim's head being covered with a hat or ski mask. (Tr. 640.)

{¶ 8} Kenneth Franklin, the driver of the Dodge Charger, approached Officer Santa and identified himself as the victim's brother. Officer Devan Wynn testified that he spoke with Franklin. He described Franklin as "crying hysterically." (Tr. 693.) Franklin nevertheless did not fully cooperate, "refusing to tell [Officer Wynn] what happened" and indicating he would give him more information at the hospital. (Tr. 693.)

{¶ 9} Crime scene investigators photographed the scene and collected physical evidence. Detective Tom Connole testified that they collected five spent 9 mm shell casings and sent them to the lab for forensic analysis. Forensic Scientist James Kooser, who analyzed the casings, testified that all five were "fired by the same unknown 9 mm caliber firearm." (Tr. 908; State's exhibit No. 105.)

{¶ 10} Viapath Technologies Intelligence Analyst Lauren Kachure testified that her company provides inmates with tablets to "make phone calls, email messages, send pictures, and [make] video phone calls." (Tr. 772-773.) All such communications are stored on Viapath servers, and Kachure testified that her role was to "assist in monitoring criminal activity for the Ohio Department of Rehabilitation and Corrections [sic]." (Tr. 772.) In that capacity, she obtained a phone call placed by inmate Darius Sitgraves. The audio recording was played in

open court for the jury. (Tr. 780.) The call was between Sitgraves and appellant. The audio captures their conversation leading up to and including the shooting, with the shots recorded on the call.

{¶ 11} Leading up to the marijuana transaction and shooting, appellant had been at the home of an acquaintance, Marquis Gholston. The incident occurred almost directly in front of Gholston's house and was captured on video. The State, without objection, offered witness Tom Ciula as an expert in video forensics. Ciula testified that he operates TC Productions, a video and audio forensics company. He testified that he reviewed and analyzed both video and audio related to the homicide and prepared a report of his findings and several composite videos. Ciula testified regarding video sources and camera angles, audio sources and overlays, the enlargement and enhancement of video footage, and the light sources caught on camera, including muzzle flashes.

{¶ 12} The exhibits Ciula identified included State's exhibit No. 93, which combined silent video footage of the shooting and appellant's call with inmate Sitgraves. Review of the exhibit indicates the two were referring to "Dookie" — a nickname for the victim — after the Dodge Charger came into view and stopped in front of the house appellant was visiting. The footage shows appellant leave Gholston's house and walk to the Dodge Charger. Shortly thereafter, movement can be seen at the back of the vehicle as the victim stepped out of the rear passenger seat. Appellant then fired five shots in rapid succession, followed by a sixth shot. The shots can be heard on the overlaid audio and can be seen as muzzle flashes from

appellant's firearm. Ciula explained the time difference between a muzzle flash captured on video, which lasts only a single frame, and various other light sources, which last multiple frames. He testified that "[n]othing that occurs from the back of the car," i.e., where the victim was standing, "is, in my professional opinion, a muzzle flash." (Tr. 799-800.) Ciula also matched audio from a neighbor's ring camera with the silent video of the shooting. This compilation, admitted as State's exhibit No. 92, has clearer audio of each gunshot.

{¶ 13} Detective Christopher Miller testified concerning his interviews of various witnesses, including Kenneth Franklin. Following his interview with Franklin, Detective Miller "sent preservation requests to Instagram in regards to [appellant's] social media." (Tr. 1021.)

{¶ 14} Tanya Oliver, the victim's mother, testified that on the night of the shooting, she went to the site of the incident to pick up "[t]wo guns." (Tr. 945.) Specifically, she went to the home that appellant had walked out of to complete the drug transaction, i.e., the home of Marquis Gholston. (Tr. 975.) Oliver testified that Gholston had removed the guns from the Dodge Charger and put them in the house. According to her testimony, Oliver brought the firearms to her sister's home.

{¶ 15} The victim died on January 22, 2022, nine days after the shooting. Dr. Andrea McCollum, who had been employed by the Cuyahoga County Coroner's Office as a forensic pathology expert during the relevant time period, testified that he died of a single gunshot wound to "the right temple." (Tr. 719.)

{¶ 16} Appellant turned himself in to police on January 25, 2022, 12 days after the shooting and three days after the victim's death. He gave consent to search his cellphone.

{¶ 17} After the victim died, Detective Tim Cramer, of the Cleveland homicide unit, became the lead investigator in the case. Detective Cramer interviewed Kenneth Franklin and learned that appellant had approached the Dodge Charger to buy marijuana. Franklin told Detective Cramer that the victim stepped outside of the vehicle and appellant then fired at the victim several times. In response to a jury question, Detective Cramer also testified without objection that Franklin told him the victim got out of the car to "brush off some Cheetos or chips that he had been eating." (Tr. 1275-1276 and 1287.)

{¶ 18} Detective Cramer interviewed appellant on March 17, 2022. The interview took place at the juvenile justice center with appellant's counsel and a prosecutor present. Detective Cramer used his body camera to record the interview, which was broken into three segments and admitted into evidence as State's exhibit Nos. 137-139.

{¶ 19} In his recorded statement — which lasts approximately 49 minutes, counting interruptions — appellant admitted to shooting the victim. He stated that he was at the home of Marquis Gholston and was interested in obtaining marijuana. Appellant then initiated an Instagram conversation with Kenneth Franklin to

arrange a transaction.[1]  Appellant asked Franklin to come to Gholston's house to complete the marijuana purchase, and Franklin agreed.

{¶ 20} While waiting for Franklin, appellant received the call from Sitgraves and began talking with him.  They remained on the phone throughout the transaction and shooting.  While much of the recorded conversation itself is difficult to discern, appellant told Detective Cramer that it included discussion of who their "real friends" were.  Next, according to appellant's statement, Franklin sent appellant an Instagram message indicating he had arrived.  Appellant did not respond to the message but walked out the front door to meet Franklin.  Franklin was driving a Dodge Charger that had pulled in front of Gholston's home.  Another person that appellant was familiar with, nicknamed T.J., was in the front passenger seat.  Appellant walked around the front of the car, to the driver's side window, to complete the marijuana transaction.  He was still on the phone with Sitgraves, and even informed Franklin of that, but appellant stated that Franklin ignored that remark.

{¶ 21} According to his recorded statement, appellant gave Franklin $20. Franklin then lurched the car forward, saying something like he was going to "pull off with your money."  Franklin then explained he was "just playing" and reached into the back of the car.  Appellant assumed he was grabbing the marijuana but stated that he observed Franklin whisper something to someone in the back seat.

---

[1] The relevant Instagram direct messages between appellant and Franklin were admitted as State's exhibit No. 136.

Appellant told Detective Cramer that he could not make out the identity of the back seat occupants because they were wearing ski masks. Franklin nevertheless completed the transaction by handing appellant the marijuana. Appellant stated he heard someone jump out of the back passenger side of the car. (Appellant clarified that while his head was down because he was taking possession of the marijuana, he both heard and saw someone emerge from the back passenger side of the vehicle.) Asked by Detective Cramer what happened next, appellant stated: "Shots. I let off shots."

{¶ 22} Next, according to his recorded statement, appellant "fled the scene" and went to a field across the street. He observed police arriving on the scene. He admitted that he was safe at this point because of the police presence but told Detective Cramer that he did not approach because he was scared for his life. Appellant explained that Kenneth Franklin's cousin had shot him approximately one year earlier. Appellant claimed he did not know the identity of the victim until he overheard someone shouting "Dookie" after the shooting. He claimed again that he did not recognize the victim because he had been wearing a ski mask.

{¶ 23} According to his statement, appellant then left the scene entirely by going to a neighboring street and meeting a friend in her car. Appellant, who had admitted that he had dropped his cell phone at the scene, was noticeably evasive in recounting exactly how he happened to meet up with someone to depart the scene by car without having a phone to contact anyone. The person driving transported

him to his mother and stepfather's house. He and his stepfather, Jerry, left to stay at a hotel in Solon, Ohio. Appellant claimed they were both scared.

{¶ 24} In his statement, appellant explained that he used a recently purchased Glock 9 mm handgun in the shooting. He admitted that after the shooting, he "broke it down" using instructions obtained from YouTube videos and that he then "got rid of it." Asked exactly how and where he disposed of the weapon, appellant was again evasive. Detective Cramer skeptically inquired how appellant could forget such details when he recalled other, less important details easily (for example, that the person who gave him a ride after the shooting was driving a bronze Infiniti vehicle). Appellant, who at one point had said he threw the gun in the garbage, stated he had thrown the separate parts of the broken-down firearm into a river or Lake Erie. Pressed for a location — east side, west side, park, parking lot — appellant, after a long silence, stated that his stepfather, Jerry, drove him to the lake to discard the firearm. He claimed not to remember the location.

{¶ 25} Detective Cramer testified that he reviewed Instagram direct messages between appellant and the victim and that the messages appeared to be marked by tension between the two, though he acknowledged that "it's also two guys, and sometimes guys talk shit." (Tr. 1116.) The series of exchanges was admitted as State's exhibit No. 132 and provided to the jury along with all other exhibits. He also testified as to his interpretation of appellant's recorded call with Sitgraves, stating that it sounded to him like appellant told Sitgraves, "He's pullin'

up on me right now." (Tr. 1253.) (Again, however, the jury was provided with the actual audio recording, and it has been provided to us for appellate review.)

{¶ 26} Following the admission of exhibits, the State indicated it intended to rest in the presence of the jury. Appellant then made a Crim.R. 29 motion for acquittal, which the court denied. The State rested in the jury's presence, and appellant then rested without calling witnesses.

{¶ 27} After closing arguments, the trial court charged the jury. The trial court's jury instructions included both a flight instruction and a self-defense instruction. The jury returned verdicts of not guilty on Count 1 and Count 8. It returned guilty verdicts on Counts 2-7, along with all firearm specifications attached to Counts 2-6. The trial court later sentenced appellant to an aggregate term of 22 years to life imprisonment.

## II. Assignments of Error

{¶ 28} Appellant presents two assignments of error for our review:

Assignment of Error No. 1: The trial court erred and abused its discretion in giving a flight instruction to the jury.

Assignment of Error No. 2: The trial court erred in entering a conviction for murder, in violation of defendant's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, as being against the manifest weight evidence as to defendant's right to self-defense.

Finding no merit to appellant's assignments of error, we affirm.

### III. Analysis

#### A. Flight Instruction

{¶ 29} In his first assignment of error, appellant argues that the trial court erred by giving a jury instruction regarding flight. "We review a trial court's issuance of a jury instruction for an abuse of discretion." *State v. Hill*, 2013-Ohio-578, ¶ 48 (8th Dist.), citing *State v. Williams*, 2009-Ohio-2026, ¶ 50 (8th Dist.); *State v. Guffie*, 2024-Ohio-2163, ¶ 145 (8th Dist.). In this context, an abuse of discretion occurs "when the instruction is not supported by the evidence." *Hill* at ¶ 48, citing *State v. Ponce*, 2010-Ohio-1741, ¶ 45 (8th Dist.).

{¶ 30} This court "has previously defined flight as 'some escape or affirmative attempt to avoid apprehension.'" *Hill* at ¶ 49, quoting *State v. Wesley*, 2002-Ohio-4429, ¶ 19 (8th Dist.). The trial court does not abuse its discretion in giving an instruction on flight and consciousness of guilt "if there is sufficient evidence presented at trial that the defendant attempted to avoid apprehension." *Hill* at ¶ 49, citing *State v. Kilpatrick*, 2009-Ohio-5555, ¶ 16 (8th Dist.), and *State v. Benjamin*, 2003-Ohio-281, ¶ 31 (8th Dist.).

{¶ 31} Appellant argues that the only apparent basis for the inclusion of a flight instruction was that he "left the scene of the crime" and that "[t]here is no evidence that [appellant] took any steps to avoid apprehension or detection other than 'mere departure from the scene.'" (Appellant's brief at p. 7 and p. 8.) While we agree with appellant that mere departure from the scene is insufficient to trigger a flight instruction, *see Guffie* at ¶ 147, the evidence presented to the jury here went

far beyond appellant leaving the scene. In his interview with Detective Cramer, appellant stated that he remained near the scene, but out of sight, until police arrived. Even though he was able to observe the police presence, and even though he admitted he was safe once police arrived, he did not approach and turn himself in.

{¶ 32} Appellant further admitted in his interview that he hid out in a hotel, away from his home, following the shooting. He admitted that he changed his Instagram name. He admitted that he deleted, or at least tried to delete, multiple Instagram direct messages. He further admitted to disassembling his firearm using instructions obtained from YouTube and then scattering the pieces with the help of his stepfather.

{¶ 33} This evidence provided sufficient basis for a flight instruction. It suggested that appellant "took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime." *Guffie*, 2024-Ohio-2163, at ¶ 147 (8th Dist.), citing *State v. Dunn*, 2015-Ohio-3138, ¶ 52 (8th Dist.). In *Guffie*, this court found a flight instruction warranted where the defendant "took additional affirmative steps to avoid detection and his involvement in the shooting — disposing of his firearm, deleting social media conversations and text messages, and lying to police." *Guffie* at ¶ 148, citing *State v. Hurt*, 2022-Ohio-2039, ¶ 75 (8th Dist.). In *Hurt*, the defendant likewise concealed evidence in an attempt to evade detection and did not turn himself in despite later asserting self-defense. *Id.* The facts here, as they relate to consciousness of guilt, closely align with

those in *Guffie* and *Hurt*. Appellant disposed of the firearm used in the shooting. He lied about the method of disposing of the firearm, at one point stating he placed it in a trash can then later saying he threw the pieces into a river or into Lake Erie. He tried to delete social media conversations. While he later claimed self-defense, he did not turn himself in until days after the shooting despite an opportunity to do so at the scene itself once police had arrived and he was admittedly safe. Given this evidence, the trial court did not err in giving a flight instruction to the jury.

{¶ 34} Moreover, even if the instruction had not been warranted, appellant has not demonstrated that any claimed error was prejudicial. "'A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error.'" *Guffie* at ¶ 149, quoting *State v. McKibbon*, 2002-Ohio-2041, ¶ 27 (1st Dist.), citing *State v. Adams*, 62 Ohio St.2d 151, 154 (1980). In our analysis, we examine the instructions as a whole. *Guffie* at ¶ 149; *State v. Jackson*, 2014-Ohio-3583, ¶ 49 (8th Dist.). "'A jury instruction constitutes prejudicial error where it results in a manifest miscarriage of justice.'" *Guffie* at ¶ 149, quoting *State v. Hancock*, 2008-Ohio-5419, ¶ 13 (12th Dist.). "Conversely, '[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.'" Crim.R. 52(A). *Guffie* at ¶ 149. *See also Jackson* at ¶ 49.

{¶ 35} Reviewing the instructions as a whole, we find no miscarriage of justice. The trial court instructed the jury that if it found "that some other motive prompted the defendant's conduct, or if you are unable to decide what the

defendant's motivation was, then you should not consider this evidence for any purpose." The instruction also indicated that the jury "alone will determine what weight, if any, to give to this evidence." As in *Guffie*, the instruction "allowed the jury to make its own conclusions on flight and to consider [appellant's] motivation for leaving" and for his other conduct purportedly suggesting consciousness of guilt. *Guffie* at ¶ 150. Parallels to *Guffie* do not end there. In that case, the defendant testified, explaining why he did not stay at the scene until police arrived and why he did not immediately contact police after the incident. Here, the jury heard appellant's recorded statement recounting his reason for not approaching officers at the scene, for staying at a hotel rather than returning home, and for deleting Instagram direct messages. As in *Guffie*, we cannot find that giving the jury instruction constituted prejudicial error, even if the trial court erred in giving it. Appellant's first assignment of error is overruled.

## B. Manifest Weight

{¶ 36} In his second assignment of error, appellant argues that his conviction was against the manifest weight of the evidence. "In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion." *Hill*, 2013-Ohio-578, at ¶ 32 (8th Dist.); *State v. Shirley*, 2025-Ohio-1064, ¶ 21 (8th Dist.); *State v. Wardlaw*, 2025-Ohio-2221, ¶ 67 (8th Dist.). In our manifest-weight analysis, we "must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflict in the evidence, the trier of fact *clearly lost its way* and

*created such a miscarriage of justice* that the conviction must be reversed and a new trial ordered." (Emphasis added.) *State v. Spencer*, 2024-Ohio-5809, ¶ 26 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 386, 387 (1997). *See also Wardlaw* at ¶ 67.

{¶ 37} An appellate court will reverse on manifest weight "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387; *State v. Williams*, 2025-Ohio-2593, ¶ 41 (8th Dist.). This is because "in a manifest-weight review, the weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact." *State v. Metz*, 2019-Ohio-4054, ¶ 70 (8th Dist.); *see also Cleveland v. Johns*, 2024-Ohio-3301, ¶ 24 (8th Dist.). Indeed, ""an appellate court may not substitute its own judgment for that of the finder of fact."" *Id.* at ¶ 24, quoting *State v. Harris*, 2021-Ohio-856, ¶ 33 (8th Dist.), quoting *State v. Maldonado*, 2020-Ohio-5616, ¶ 40 (8th Dist.). "The use of the word 'manifest' in the standard of review 'means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence.'" *State v. Harris*, 2020-Ohio-1497, ¶ 28 (8th Dist.), quoting *State v. Hernandez,* 2018-Ohio-5031, ¶ 20 (8th Dist.); *Wardlaw* at ¶ 67.

{¶ 38} "Self-defense is an affirmative defense, and therefore, 'a defendant claiming self-defense does not seek to negate an element of the offense but rather seeks to relieve himself from liability.'" *State v. Gardner*, 2022-Ohio-381, ¶ 21 (8th Dist.), quoting *Cleveland v. Williams*, 2003-Ohio-31, ¶ 10 (8th Dist.). The claim

that a verdict should be reversed based on self-defense is therefore properly reviewed under a manifest-weight standard.  *Gardner* at ¶ 22, citing *Williams* at ¶ 10.

{¶ 39} Appellant, wielding a firearm, indisputably used deadly force that resulted in the death of the victim.  This court has written:

> A person may use deadly force in self-defense where he or she (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger.  *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 14, citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 2002-Ohio 68, 759 N.E.2d 1240 (2002).

*State v. Ratliff*, 2023-Ohio-1970, ¶ 27 (8th Dist.).  *See also State v. Gillis*, 2024-Ohio-726, ¶ 50 (8th Dist.); *State v. Jackson*, 2020-Ohio-1606, ¶ 17 (8th Dist.).  For the State to satisfy its burden of proving beyond a reasonable doubt that a defendant did not use force in self-defense, it must disprove at least one of the elements of self-defense.  *Id.*, citing *State v. Davidson-Dixon*, 2021-Ohio-1485, ¶ 18 (8th Dist.).

{¶ 40} More specifically, to disprove a self-defense claim in  a case involving deadly force, the State must present evidence beyond a reasonable doubt that the defendant (1) was at fault in creating the situation giving rise to the affray; (2) did not have a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of force; or (3) violated a duty to retreat or avoid danger.  *Gillis* at ¶ 50; *Jackson* at¶ 17.

{¶ 41} "The first and third elements are straightforward and are applied as written." *State v. Smith*, 2024-Ohio-2811, ¶ 9 (8th Dist.). With respect to the second element, however, ""the test for a bona fide belief of imminent bodily harm is both objective and subjective: whether the defendant's belief is objectively reasonable and whether the defendant subjectively had an honest belief of imminent bodily harm."" *Id.*, quoting *State v. French*, 2024-Ohio-1256, ¶ 26 (1st Dist.), quoting *State v. Warth*, 2023-Ohio-3641, ¶ 29 (1st Dist.). "[T]here must be *both* reasonable (objective) grounds to believe that harm is imminent, and an honest (subjective) belief that harm is imminent." (Emphasis added.) *Parma v. Treanor*, 2018-Ohio-3166, ¶ 25 (8th Dist.).

{¶ 42} Moreover, "'[i]t is well-established that the defendant may only use "that force which is reasonably necessary to repel the attack."'" *State v. Giglio*, 2023-Ohio-2178, ¶ 24 (8th Dist.), quoting *State v. Rhymer*, 2021-Ohio-2908, ¶ 19 (1st Dist.), quoting *State v. Williford*, 49 Ohio St.3d 247, 249 (1990). "If a jury finds that a defendant used unreasonable force, then it cannot find the second element in favor of the defendant." *Rhymer* at ¶ 20. In other words, ""[i]mplicit in th[e] second element of self-defense, i.e. that the defendant's use of deadly force was in 'good faith,' is the requirement that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat."" *State v. Harris*, 2025-Ohio-2774, ¶ 19 (8th Dist.), quoting *Ratliff*, 2023-Ohio-1970, at ¶ 31 (8th Dist.), quoting *State v. Hendrickson*, 2009-Ohio-4416, ¶ 31 (4th Dist.). Finally, "because of the cumulative nature of the elements of self-defense, 'the state need

only disprove one of the elements of self-defense beyond a reasonable doubt at trial.'" *Gardner*, 2022-Ohio-381, at ¶ 24 (8th Dist.), quoting *State v. Walker*, 2021-Ohio-2037, ¶ 13 (8th Dist.).

{¶ 43} Claims of self-defense "'are generally an issue of credibility.'" *Gardner* at ¶ 26, quoting *Walker* at ¶ 13. "'Whether the state disproves any of the elements of self-defense is left to the trier of fact to decide.'" *Gardner* at ¶ 26, quoting *Davidson-Dixon*, 2021-Ohio-1485, at ¶ 36 (8th Dist.), citing *State v. Morton*, 2002-Ohio-813, ¶ 52 (8th Dist.). *See also State v. Chappell*, 2024-Ohio-1895, ¶ 57 (8th Dist.). "The jury may take note of any inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony.'" *State v. Sheline*, 2019-Ohio-528, ¶ 96 (8th Dist.), quoting *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.).

{¶ 44} Appellant did not testify at trial, as was his right. The jury did, however, have the benefit of appellant's statement, recorded on video and admitted as State's exhibit Nos. 137-139. It also had at its disposal video of the shooting itself overlaid with audio from other sources, including appellant's recorded phone call with inmate Sitgraves. Our independent review of appellant's recorded statement, the video footage and audio overlays, and the remainder of the record confirms that the jury could reasonably find that the State proved beyond a reasonable doubt that appellant did not have a bona fide belief (objectively or subjectively) that he was in imminent danger of death or great bodily harm and that resort to deadly force was

not warranted and proportional to the perceived threat, i.e., that his or her only means of escape from such danger was in the use of deadly force.

{¶ 45} In his recorded statement to police, appellant did not state that he had been threatened by anyone, inside or outside of the Dodge Charger, with a gun or with any other weapon. He did not indicate that he saw any occupants of the car, or the victim, brandish or even hold a weapon. He instead told police that he noticed someone emerge from the back passenger side of the vehicle, that he immediately "let off shots," and that he fled the scene. In light of this, there was little conflicting evidence for the jury to resolve. The video of the event itself, combined with appellant's recorded statement, suggests at most that he was startled rather than threatened. Appellant did not claim that the victim had fired a weapon, and the jury was free to credit the testimony of a video forensics expert that the only muzzle flashes captured on video came from appellant's weapon. The evidence suggests that despite the lack of any objective threat of death or great bodily harm, appellant immediately resorted to deadly force, firing five shots at the victim in rapid succession.[2] In light of this, a reasonable jury could find that his use of deadly force was disproportionate to any perceived threat, especially where appellant himself never identified one.

{¶ 46} This holds true even considering appellant's past history of being shot. That incident was remote in time, occurring in February 2021, nearly a year prior to

---

[2] Based upon the video and overlaid audio, the sixth shot appears to have occurred after appellant began retreating from the car, stumbling backwards.

the shooting in this case. Appellant was shot in the hip but refused to cooperate with police by identifying a suspect. It was only during his interview with Detective Cramer that appellant claimed the assailant was related to Franklin and the victim. The jury could view this belated link with skepticism. In addition, in his recorded statement, appellant claimed he did not know the identity of the person he shot until he was running away and heard someone yell "Dookie." This undercuts any suggestion that the victim's presence in the car caused him some particular fear because of the prior incident. It also bears repeating that appellant set up the marijuana transaction and was indisputably aware, based on Instagram direct messages and the recorded phone call with Sitgraves, that he would be meeting with Franklin. "The State may disprove self-defense by demonstrating that the defendant's belief was not objectively reasonable or that he did not have an honest subjective belief that he faced imminent death or great bodily harm." *State v. Jones*, 2025-Ohio-168, ¶ 19 (8th Dist.). In the absence of evidence that the victim or anyone else actually threatened appellant, either with or without a weapon, a rational jury could conclude that any claimed fear of imminent death or great bodily harm was neither objectively reasonable nor honestly held. Indeed, in contrast to *State v. Miles*, 2024-Ohio-5321 (8th Dist.), another case in which this court upheld a jury's rejection of a self-defense claim, appellant here never claimed to have seen a gun or other deadly weapon during the encounter. *See id.* at ¶ 24 (in road-rage case, "[i]t was not until after the police told [Miles] that he was a suspect in a

vehicular assault that Miles told the police he believed [victim] was reaching for a gun[,]" and "[t]rial was the first time Miles claimed that he actually saw a gun").

{¶ 47} Appellant's trial counsel invited the jury to consider whether Franklin or others in the Dodge Charger hatched a scheme to rob appellant, even though appellant himself had initiated the marijuana purchase and was well known to the car's occupants. He relies principally on the testimony of Tanya Oliver that Gholston had helped remove guns from the Dodge Charger before police arrived and, further, on appellant's own statement to police that individuals in the back of the car were wearing ski masks. No evidence presented to the jury, however, actually suggested that a robbery of appellant was underway, much less that appellant saw a gun, that any gun was pointed at him, or that anyone, ski masks or not, threatened him in any fashion. As noted in Detective Cramer's testimony, appellant had every opportunity during his lengthy recorded statement to indicate that he had been threatened, with or without the display of a weapon, or that the marijuana transaction had pivoted to a robbery. Over the course of more than 40 minutes, he said nothing of this nature. The State pointedly asked Detective Cramer whether he had ever interviewed a robbery victim who neglected to mention that they were being robbed. Unsurprisingly, he answered in the negative. (Tr. 1272-1273.)

{¶ 48} Moreover, the State presented evidence that Franklin, the driver of the Dodge Charger, was later convicted of carjacking and, by the time of trial, had begun serving a lengthy sentence in federal prison. A reasonable jury could view

this fact as suggesting a motive to hide the firearms distinct from any purported plan to rob appellant.

{¶ 49} Even if appellant's robbery theory were plausible, we cannot say that the jury lost its way in rejecting it. "'When there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not the province of this court to choose which version we believe.'" *Sheline*, 2019-Ohio-528, at ¶ 102 (8th Dist.), quoting *State v. Dyke*, 2002 Ohio App. LEXIS 1197, *6 (7th Dist. Mar. 13, 2002). *See also State v. Burton*, 2019-Ohio-2431, ¶ 55 (8th Dist.); *State v. Ford*, 2019-Ohio-2570, ¶ 79 (8th Dist.). A conviction is "not against the manifest weight of the evidence merely because the jury rejected the defense's theories and found the state's version of the events to be more believable." *Sheline* at ¶ 102. Here, the jury could reasonably find that no individual on the scene threatened anyone with death or great bodily harm until the moment appellant used his firearm. There was a lack of objectively threatening conduct by the victim or anyone else in the car. *See Smith*, 2024-Ohio-2811, at ¶ 13 (8th Dist.) (Smith "escalated the potential lethality of the altercation by using a deadly weapon in a situation in which the objective evidence did not establish that either he or his brother were in imminent danger of being severely beaten by the victim."); *State v. Gilcrease*, 2020-Ohio-487, ¶ 73 (8th Dist.) (where amount of force is so disproportionate as to evidence unreasonable purpose to injure, defense of self-defense unavailable).

{¶ 50} Having reviewed the entire record, this is not the exceptional case in which the jury clearly lost its way and created a manifest miscarriage of justice. Appellant's second assignment of error is overruled.

{¶ 51} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

EILEEN A. GALLAGHER, A.J., and
MICHELLE J. SHEEHAN, J., CONCUR